Nicholas E. D'ANDREA,
Plaintiff-Appellant,

v.

Ralph W. ADAMS, President of Troy
State University, et al.,
Defendants-Appellees.

No. 78–1499.

United States Court of Appeals,
Fifth Circuit.

Sept. 26, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 27, 1980.

Jerry D. Anker, Robert M. Cohan, Washington, D. C., Myron H. Thompson, Dothan, Ala., James M. Altman, Nat'l. Ed. Ass'n, Washington, D. C., for plaintiff-appellant.

Coale, Helmsing, Lyons & Sims, Champ Lyons, Jr., Mobile, Ala., Capell, Howard Knabe & Cobbs, Thomas S. Lawson, Jr., Montgomery, Ala., for defendants-appellees.

Before MORGAN, ANDERSON and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This appeal concerns a controversy between Dr. Nicholas D'Andrea, a tenured assistant professor of geography at Troy State University (TSU) in Alabama, and four administrators (collectively referred to as the Administrators) of that school: Dr. Adams, President of TSU; Dr. Barnett, Chief Academic Dean; Dr. Long, Dean of the College of Arts and Sciences; and Dr. Tway, Chairman of the Department of History and Social Science. The issue on this appeal is whether the Administrators were

within their rights in discharging Dr. D'Andrea for communicating information he possessed that suggested impropriety in the use of TSU funds to a legislative budget subcommittee that was engaged in reviewing funding of state agencies, including TSU. Dr. D'Andrea contends that his statements were protected by the first amendment. The Administrators contend that Dr. D'Andrea's statements were not constitutionally protected because they materially and substantially interfered with the performance of his duties and with the functioning of school programs, and because the statements were made with reckless disregard for their truth. Additionally, the Administrators contend that there was insufficient proof for the jury to conclude that defendants Tway and Long knew of Dr. D'Andrea's statements to the state legislature, and hence to conclude that they participated in his discharge in retaliation for those statements. Under proper instructions, the jury returned a verdict in Dr. D'Andrea's favor against all the Administrators. The trial court granted the Administrators' motion for judgment n. o. v., on the ground that Dr. D'Andrea's statements were not constitutionally protected and also on the ground that there was insufficient evidence to support a verdict against defendants Tway and Long. We reverse.

In November 1976, Dr. D'Andrea went to the Alabama Capital in Montgomery and spoke to a Mr. Kirkland, then an administrative assistant to the Lieutenant Governor, and to an examiner from the Alabama Department of Examiners of Public Accounts, who was engaged in an examination of TSU finances in preparation for budget subcommittee hearings in the state legislature regarding the funding of the school. At that time, Dr. D'Andrea conveyed to Mr. Kirkland and the examiner information he had received from other people, whom he identified, concerning assertedly improper uses of TSU funds. Whether the information was true, partially true, or wholly false cannot be determined from the record because the trial court pretermitted inquiry into that question. For purposes of this appeal, we assume the information was inaccurate. Apparently, TSU received a "clean bill of health" after the legislative examination of the school's finances and it received the appropriation it had sought. Dr. Adams in particular was commended for his management of the school.

In January 1977, Dr. D'Andrea was told that the geography program at the school was going to be discontinued, and that his services as a professor of geography would no longer be needed. The decision to eliminate the geography program was made at a meeting on January 13, 1977, attended only by the Administrators. Dr. D'Andrea exercised his right as a tenured faculty member under TSU's procedures to seek other employment at the school for which he was qualified. The Ad Hoc Committee on Credentials did not recommend placement in another position, and Dr. D'Andrea sought review of this decision by the Faculty Personnel Advisory Committee. Dr. D'Andrea received notice of the hearing, which indicated that, because of the Ad Hoc Committee's recommendation, termination of the geography program "would carry with it a termination of your tenured status at the University." The notice informed Dr. D'Andrea that the hearing would cover the decision to terminate the geography program and the recommendation that Dr. D'Andrea not be offered an alternative teaching position. After a hearing, at which Dr. D'Andrea was present and represented by an attorney, the Faculty Committee upheld the recommendation of the Ad Hoc Committee and the decision to terminate the geography program. Dr. D'Andrea was therefore out of a job.

■ Before the beginning of the fall semester, however, TSU determined that the decision to terminate the geography program had been precipitate, because geography instruction is a necessary component of the degree in elementary education offered by the school and because enrollment data for the fall semester apparently indicated a burgeoning interest in geography. The school therefore reinstated geography as a

minor area of study and offered D'Andrea reemployment, which he accepted. In the meantime, however, Dr. D'Andrea had filed this action, alleging that the decision to terminate the geography program was in fact a retaliation against him for his statements to state officials concerning TSU finances, and as such violated his first amendment rights. The case was not mooted by reason of his reemployment, because he had been dismissed for a time and because he sought injunctive relief against future violations of his constitutional rights.

The jury was properly instructed that they could find for Dr. D'Andrea only (1) if he convinced them, by a preponderance of the evidence, that his contact with state officials was constitutionally protected and was a substantial or motivating factor in the decision to terminate the geography program, and (2) if the Administrators failed to convince them, using the same standard, that they would have terminated the geography program even absent Dr. D'Andrea's contact with state officials. *See Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The jury returned a verdict in favor of Dr. D'Andrea, and the judgment n. o. v. did not attack the jury's determination that the termination of the geography program was motivated by Dr. D'Andrea's contact with state officials and that the termination would not have occurred absent that conduct.[1] Accordingly, there is no *Mt. Healthy* issue in this appeal.

The only questions we face are (1) whether there was sufficient evidence for a reasonable jury to conclude that on January 13 Tway and Long knew about Dr. D'Andrea's contact with state officials, and (2) whether, as a matter of law, Dr. D'Andrea's statements to those officials were protected by the first amendment.

In passing on the first question, we are guided by the standard of review for judgments n. o. v. enunciated in *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). Considering all the evidence "in the light and with all reasonable inferences most favorable to" Dr. D'Andrea, our task is to decide whether Dr. D'Andrea presented "evidence of such quality and weight that reasonable and fairminded [jurors] in the exercise of impartial judgment might reach different conclusions" with regard to the question whether Tway and Long knew about Dr. D'Andrea's statements when they attended the January 13 meeting at which all the Administrators agreed to terminate the geography program. "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Id.*

Under the *Boeing* standard, there was sufficient evidence for a reasonable jury to conclude that all the Administrators discussed Dr. D'Andrea's statements to state officials when they met on January 13. Only the Administrators were present at the meeting. The jury's necessary finding that Dr. Adams and Dr. Barnett knew of the statements at that time is not challenged on this appeal. Dr. Tway was the last to arrive at that meeting. He testified as follows regarding his arrival at the meeting and the ensuing discussion:

> DR. TWAY: When I first went into the office Dr. Barnett and Dr. Long were sitting off to my right. I pulled my chair up to the front right-hand corner of the president's desk and he was rather off center behind his desk. . . I pulled my chair up to his desk and he said to me, "What are we going to

---

1. With regard to Tway and Long, the trial court held that there was not sufficient evidence for a reasonable jury to conclude that those defendants knew of Dr. D'Andrea's contact with state officials. Since they could not be motivated by what they did not know, if the trial court was correct Dr. D'Andrea did not establish the prima facie case required by *Mt. Healthy.* Because we hold that there was sufficient evidence for a reasonable jury to conclude that Tway and Long knew of Dr. D'Andrea's statements to state officials, and because the verdicts against those defendants indicate that the jury, properly instructed, did so conclude, all the Administrators stand in the same position with regard to the satisfaction of *Mt. Healthy*'s prima facie case requirements.

do—what about D'Andrea?" . . . And I said, "Well, what about Dr. D'Andrea?" And he said—I don't attempt to quote verbatim, it is a long time back, but something in the sense, "Well, he is just not as loyal as a fellow ought to be." And I made no response to that. I had no reason to be in defense or complimentary of his loyalty. The conversation immediately turned to discussion which led me to respond to the president it's my impression that if a man has tenure he could only be dismissed from his position as such for moral turpitude, incompetency to perform the job, or being guilty of some criminal offense. I said I don't know of either moral turpitude or criminal offense of Dr. D'Andrea. I went on to say we would have difficulty convincing anyone that the man was incompetent since he had been runner-up once and perhaps more than once for the outstanding teacher award known as Ingles Award. No sooner had I made that comment than the four of us went into a discussion of the viability of the geography program, for which I presume I was called in there.

The jury thus had before it direct evidence that Dr. D'Andrea's loyalty to TSU was questioned in the presence of all the Administrators at the January 13 meeting. No witness offered any explanation of what Dr. Adams may have meant. Dr. Adams denied that he characterized Dr. D'Andrea as disloyal.

In addition to Dr. Tway's testimony, the jury had before it evidence tending to show that although the problem of low enrollment in the geography program—the reason asserted by defendants for the termination of the program—had been informally discussed by members of the school administration for several months before the January 13 meeting, that meeting was not planned in advance. Rather, everyone involved concedes that the meeting, lasting only about an hour, was convened on the spur of the moment. Although the problem

of low enrollment was assertedly the sole reason for terminating the geography program, no enrollment statistics were available at the meeting. No faculty committees were consulted concerning that decision, although the evidence showed that there were several such committees whose responsibilities included advising on curricular changes.

■ Taking all the evidence into consideration, a reasonable jury could conclude that, despite the Administrators' denials, Dr. D'Andrea's statements to state officials were discussed by all the Administrators at the January 13 meeting. No issue was taken with the jury's conclusion that Drs. Adams and Barnett knew of the statements. The jury could reasonably have believed Dr. Tway's testimony that Dr. Adams raised the question of Dr. D'Andrea's loyalty, and disbelieved his testimony that—although he knew of nothing reflecting poorly on Dr. D'Andrea's character—he simply did not challenge or inquire about the president's assertion that Dr. D'Andrea, a professor in Dr. Tway's department, was disloyal. Finally, a jury could reasonably conclude that a major curricular revision would not normally have been instituted in such a hasty and indeliberate fashion, and that the decision to terminate the geography program was, under those circumstances, deliberately done with the acquiescence of all the Administrators for the purpose of penalizing Dr. D'Andrea for his statements to state officials. We therefore hold that the district court erred in concluding that there was insufficient evidence that at the January 13 meeting defendants Tway and Long knew about the statements made by Dr. D'Andrea to state officials.

■ We turn now to the fundamental issue on this appeal, which is whether Dr. D'Andrea's statements to state officials were protected by the first amendment. Dr. D'Andrea had the burden of proving that he was dismissed for exercising constitutional rights.[2] *Fluker v. Alabama State*

2. The Administrators also contend that Dr. D'Andrea's statements were not protected by the first amendment because they were false and made with reckless disregard for the truth.

*Bd. of Educ.*, 441 F.2d 201, 206 (5th Cir. 1971). This he did to the jury's satisfaction. "At that point, the State assume[d] the burden of justifying its action by showing that the complainant's activities 'materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school.' " *Id.* (internal quotation from *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966), quoted in *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969)).

The trial court's basis for entering judgment n. o. v., in favor of all the Administrators, was that Dr. D'Andrea's statements necessarily interfered with his duties at TSU. The court said:

> While Dr. D'Andrea was primarily employed as a school teacher and, to a lesser extent, as an administrator, he was employed to effect the program of Troy State University and the primary purpose of his employment was to present an effective educational program at the University. The effectiveness of the program would be directly dependent upon the ability of the University officials to obtain proper financing through the Alabama Legislature. Any attempt to discredit the program of the University in the eyes of the State Legislature must necessarily interfere with the program itself and would, in the opinion of this Court, "materially and substantially interfere with the duties required to be performed by" Dr. D'Andrea. The fact that much of the information distributed

by Dr. D'Andrea was obtained from less than reliable sources and was not substantiated aggravates the Plaintiff's violation of his obligations to the program of the University.

In *Pickering v. Board of Education*, 391 U.S. 563, 568–73, 88 S.Ct. 1731, 1734–37, 20 L.Ed.2d 811 (1968), the Supreme Court attempted to adumbrate "some of the general lines along which an analysis of the controlling interests" implicated in a dismissal-from-public-employment-for-speech case should run. One consideration the Court thought relevant was whether the employee's statements were critical of a person "with whom appellant would normally be in contact in the course of his daily work as a teacher," such that the criticism might impede "either discipline by immediate superiors or harmony among coworkers." *Id.* at 569–70, 88 S.Ct. at 1735. The evidence shows that Dr. D'Andrea's statements implicated only "higher administrative officials" at TSU, and there is no evidence that Dr. D'Andrea named any specific school official. Therefore, the evidence does not support the proposition that the statements for which Dr. D'Andrea was dismissed were, directly or implicitly, critical of people "with whom appellant would normally be in contact in the course of his daily work."

Nor does the evidence show that Dr. D'Andrea's duties at TSU placed him in a position "in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that [his statements] would seriously

---

The "knowing or reckless falsehood" is not protected by the Constitution, *Garrison v. Louisiana.* 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). As we have noted the trial court pretermitted inquiry into the accuracy of the information conveyed in Dr. D'Andrea's statements, and for purposes of the appeal we assume that the underlying information conveyed by the statements was inaccurate. The jury, however, was instructed that "a false statement made with reckless disregard of the truth, however, does not enjoy Constitutional protection and cannot be made the basis of a verdict for the plaintiff in this action if standing alone," and returned a verdict for Dr. D'An-

drea, from which we infer that they found that the statements were not made with reckless disregard for the truth. The judgment n. o. v. did not attack this necessary jury determination. In any event, even if the *underlying information* conveyed in Dr. D'Andrea's statements was inaccurate, his statements cannot, on this record, be characterized as false. The evidence clearly shows that Dr. D'Andrea identified his information as hearsay or second-hand. A statement that "someone told me" or "I have heard" certain information simply is not false—even if the information is inaccurate—unless the speaker has not in fact acquired the information from another.

undermine the effectiveness of the working relationship between them . . . ." *Id.* at 570 n. 3, 88 S.Ct. at 1735 n. 3.

The *Pickering* Court next considered the impact of false statements by a teacher on school operations. The Court differentiated between the impact of critical statements on the working relationship of the speaker and his superiors or coworkers and the impact of critical, and inaccurate, statements on school operations. As we have just said, the former impact is not relevant here because there is no evidence to show that the relationship between Dr. D'Andrea and "higher administrative officials" was a "close working relationship for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper function." *Id.* at 570, 88 S.Ct. at 1735.

With regard to the impact on school operations, the Court first noted that the school board had not shown that Pickering's statements, in the form of a letter to the editor of a local paper, had any actual detrimental impact upon school operations. The same is true of this case. The *Pickering* Court noted, however, that since Pickering's statements, which criticized the school board for expending too much money on athletics, were made *after* the proposal for a tax increase for school finances was defeated at the polls, those statements could "have had no effect on the ability of the school district to raise necessary revenue." *Id.* at 571, 88 S.Ct. at 1736. Since D'Andrea's statements were made at a time when TSU was seeking an appropriation from the state legislature, his statements *could* have had an effect on TSU's ability to raise necessary revenue, although the evidence suggests that they did not. The Court went on to emphasize, however, that the question whether a school needs additional funds is a matter of legitimate public concern "on which the judgment of the school administration . . . cannot . . . be taken as conclusive." *Id.* To accept the Administrators' position that the interference that justifies dismissal of a public employee exists whenever a professor makes statements that present "a substantial risk of weakening and undermining the state legislature's support for the University" would be to impose on teachers in public employment a general duty of loyalty to the specific goals of the administration, a position specifically rejected by the *Pickering* Court. *Id.* at 568–69, 88 S.Ct. at 1734–35.

■ *Pickering* makes it clear that even when a school is seeking revenue the administration considers necessary to school operations, a school employee is free to speak openly on the question, even when he disagrees with the administration. This case, however, includes some circumstances not present in *Pickering.* The most important of these is that Pickering's statements were made in a public forum, while Dr. D'Andrea's statements were made privately. Both teachers' statements were addressed to the forum that held their respective schools' pursestrings: Pickering's to the general public, since they voted on proposed tax increases for school finances; Dr. D'Andrea's to a state official connected with the state legislative budget subcommittee, which makes recommendations concerning appropriations for state agencies.

Although the Administrators concede that *Pickering* permits free and open public criticism of school policy by school employees, and that *Givhan v. Western Line Cons. Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), protects criticism of a superior addressed privately to the superior by a public employee, the Administrators suggest that the opportunity to respond to and rebut such criticism is absent here, and that such an opportunity is a fundamental factor to be considered in determining whether the *Pickering* balance of competing state and individual interests tips in favor of first amendment protection for critical statements made by public employees. The basic inquiry in *Pickering* was whether "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is . . . significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 573, 88 S.Ct. at 1737.

Although the Court suggested that the opportunity to rebut or clarify inaccurate factual statements by a teacher was a factor to be considered in the *Pickering* balance, it did not say that such a consideration was determinative. Moreover, the Court seemed more concerned with the possibility that in some circumstances a teacher's statements might, *because of their subject matter*, be given undue credit, than with the question whether the teacher addressed himself to the general public rather than to some smaller audience. The Court noted that the matters Pickering discussed were not "so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." *Id.* at 572, 88 S.Ct. at 1736.

▆ The circumstances in which Dr. D'Andrea's statements were made do not remove the statements from the protection of the first amendment. The allegations did not concern matters as to which Dr. D'Andrea might be presumed to have greater access to the real facts than would his intended audience. To be certain, as a member of the TSU community he might well have greater access to the real facts than would the general public; but he was careful to identify his information as hearsay when it was, in fact, second-hand information; and it must be remembered that he was delivering the information to a legislative subcommittee, not to the general public. That he identified the sources of his information clearly suggests that he expected the legislature to investigate and verify the allegations before acting upon them; and, of course, a state legislature has investigative powers not possessed by members of the general public. Moreover, the Administrators' allegation that the circumstances in which Dr. D'Andrea's statements were made left them no opportunity to rebut the charges must be considered in the light of what actually happened. The record in this case suggests that, like Pickering's letter, Dr. D'Andrea's statements were met "with massive apathy and total disbelief." It is only reasonable to assume that

had the officials to whom Dr. D'Andrea spoke credited the information he conveyed, they would have asked TSU officials to comment on, explain, or deny the rumors.

What was said in *Swaaley v. United States*, 376 F.2d 857 (Ct.Cl.1967), is apposite here. In that case Swaaley was dismissed from his job at the New York Naval Shipyard after he sent a letter to the Secretary of the Navy, and no one else, charging that graft and corruption infected promotional decisions. The court observed:

> An employee writing a letter such as we have here might be presumed to desire that the Department would cause his charges to be investigated. He would almost never be able to prove anything himself; that is hard enough for trained investigators using sophisticated techniques, and yet solely by rumor and hearsay he may have a pretty good idea where the bodies are buried. Hence, to say an employee reporting what he believes is going on is guilty of misconduct if he cannot prove it, is tantamount to saying he is not to transmit anything at all. Any regulation which would compel the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of dismissal from his job—leads to "self-censorship," a result which cannot be tolerated in this area.

376 F.2d at 861–62. [citations omitted].

Dr. D'Andrea may well have believed that his information was too insubstantial to justify a public accusation, yet substantial enough to warrant investigation by the budget subcommittee. Moreover, he may have been apprehensive that disclosure of the information and of his visit to Montgomery to administrative officials at TSU would result in his dismissal or other objectionable consequences. He was entitled to assume that his statements would be dealt with prudently; that the rumors he had heard would be investigated; and that if they appeared to have a factual foundation, the TSU officials involved would have an opportunity to respond to them.

As Judge Goldberg observed in *Porter v. Califano*, 592 F.2d 770, 779 (5th Cir. 1979), "*Pickering* states that the First Amend-

ment requires the government not just to show that certain employee speech injures the government, but to show that the benefits of preventing the injury actually outweigh the profound benefits of free speech in this society." The Administrators have utterly failed to make such a showing. Accordingly, we hold that the entry of judgment n. o. v. by the district court was error.

After the favorable verdict and before entry of the judgment n. o. v., the trial court awarded Dr. D'Andrea attorney fees and expenses totalling $7,832.70 for the trial of the case, pursuant to 42 U.S.C. § 1988. That award is to be reinstated along with Dr. D'Andrea's favorable jury verdict. In addition, Dr. D'Andrea is entitled to an award of costs, including as an item of costs an attorney fee, for the prosecution of this appeal. While we have authority to determine the attorney fee to which he is entitled, *Knighton v. Watkins*, 616 F.2d 795 (5th Cir. 1980), we consider it better, under the circumstances, to remand the case to the district court for a determination of the proper costs to be awarded, in accordance with the standards in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

REVERSED and REMANDED with directions.