662 F.2d 1055
 27 Fair Empl.Prac.Cas. 1, 27 Empl. Prac. Dec.
P 32,198,
1 Ed. Law Rep. 101, 9 Fed. R. Evid. Serv. 417
 Daniel KIM and Richard Bright, Appellants,
v.
COPPIN STATE COLLEGE; Calvin W. Burnett, individually and as
President of Coppin State College; J. Carson Dowell,
Chairman; H. Gray Reeves; Edgar F. Berman; George M. Brooks;
Charles H. Foelber; Victor Frenkil; A. Harris Grossman;
Joyce R. Phillips; James A. Sensenbaugh; George T.
Stansbury; The Honorable J. Millard Tawes, individually and
constituting the Board of Trustees of the State Universities
and Colleges of Maryland, Appellees.
 No. 79-1386.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1981.
Decided Oct. 26, 1981.
 
 Glen Marcus Fallin, Baltimore, Md., for appellants.
 William A. Kahn, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen. of Maryland, Baltimore, Md., on brief), for appellees.
 Before WINTER, Chief Judge, and RUSSELL and WIDENER, Circuit Judges.
 WINTER, Chief Judge:
 
 
 1
 Plaintiffs, two members of the faculty of Coppin State College in Baltimore, appeal from the district court's directed verdict in favor of defendants issued after the jury failed to reach a determination of their claims of discrimination in compensation, promotion and other working conditions under 42 U.S.C. §§ 1981 and 1983 (1976) and from the district court's findings that defendants did not violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976). We affirm the judgment of the district court on the issues of promotion and other working conditions, but vacate the judgment on the issue of alleged discrimination in the compensation of plaintiffs and remand the case for a new trial.
 
 I.
 
 2
 Coppin State College in Baltimore, Maryland, is a college predominantly attended by blacks, and its administration is dominated by blacks, although there are a substantial number of whites on the faculty. The defendant college president, Calvin W. Burnett, Ph.D., is black. Plaintiff, Daniel Kim, Ph.D., a full professor at Coppin State since 1970, was born in Korea and is of Asian extraction. Plaintiff, Richard Bright, Ph.D., an associate professor at the school since 1969, is white.
 
 
 3
 Plaintiffs originally filed charges with the federal Equal Employment Opportunity Commission on June 26, 1974, apparently alleging discrimination in their working conditions.[1] The Commission dismissed the charges and issued a right to sue letter. Plaintiffs thereupon sued Coppin State, Burnett and the Board of Trustees of the State Universities and Colleges of Maryland on February 4, 1977, alleging discrimination in promotion, compensation and other working conditions in violation of the Reconstruction Civil Rights Acts, 42 U.S.C. §§ 1981 and 1983 (1976), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976). Plaintiffs do not contest the district court's dismissal of the Maryland's university trustees from the case or its dismissal of the §§ 1981 and 1983 claims against the college.
 
 
 4
 Professors Kim and Bright sought to prove at trial, among other things, that the college administration impermissibly discriminated against them because of their race with respect to telephone service, secretarial assistance, office space, reimbursement for travel expenses, the preparation and administration of a National Science Foundation grant, sabbatical leave, promotion and compensation. The jury failed to reach agreement on a verdict, and the district court declared a mistrial. Defendants moved for a directed verdict, which the district court granted, incorporating its findings as the trier of fact of the claims under Title VII. It determined that plaintiffs had failed to substantiate many of their allegations, that some were barred by limitations, that they had failed to rebut the legitimate nondiscriminatory reasons offered by defendants to justify their actions as required by Title VII, and that they had failed to establish the discriminatory purpose of defendants' actions as required by the Reconstruction Civil Rights Acts. Plaintiffs have circumscribed their contentions on this appeal. They assert that the district court applied an improper legal standard in granting the directed verdict, that substantial issues of material facts remained in controversy with respect to compensation, promotion and sabbatical leave, that the district court's findings under Title VII were clearly erroneous, that it improperly excluded evidence, and that they are entitled to attorneys' fees as prevailing parties in the litigation.
 
 II.
 
 5
 At the outset, the different legal standards applicable to this case should be noted. Under plaintiffs' Reconstruction Civil Rights Acts claims, the jury served as the trier of fact, and, in order to prevail, plaintiffs had the burden of proving Dr. Burnett's discriminatory purpose in taking employment actions adverse to them.[2] Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Under their Title VII claims, the district court served as the trier of fact, and, in order to prevail, plaintiffs had the burden of proving employment discrimination. Under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny, the college could dispel the inference of discrimination raised by plaintiffs' showing of disparate treatment by demonstrating legitimate, nondiscriminatory reasons for its actions, which plaintiffs in turn could rebut by exposing such reasons as mere pretexts.
 
 
 6
 The Title VII findings of the district court can only be reversed on appeal if they are clearly erroneous. That would be also true of a jury verdict on the Reconstruction Civil Rights Acts claims. In this case, however, the district court directed a verdict for defendants after the jury failed to agree on a verdict.
 
 
 7
 Plaintiffs argue that a directed verdict is appropriate only under circumstances identical to that under which summary judgment is appropriate, so that it may not be granted unless no genuine issue of material fact remains after resolving all conflicting inferences in the evidence in their favor. The legal standards for directed verdicts and summary judgment are indeed similar, but they are sufficiently distinct in a way that bears on this case. In considering a motion for summary judgment, the district court must give the benefit of the doubt to the party who asserts he can prove a dubious proposition at trial. In considering a motion for a directed verdict, in contrast, the district court has had the benefit of seeing what the parties alleged they could prove prior to trial tested in the crucible of open court. Accordingly, the district court is entitled to grant a directed verdict even though some evidence supports the opposite position so long as "there are no controverted issues of fact upon which reasonable minds could differ." Proctor v. Colonial Refrigerated Transp., Inc., 494 F.2d 89, 93 (4 Cir. 1974); Pogue v. Retail Credit Co., 453 F.2d 336, 338 (4 Cir. 1972), cert. denied, 409 U.S. 1109, 93 S.Ct. 910, 34 L.Ed.2d 689 (1973); Wachovia Bank & Trust Co. v. United States, 288 F.2d 750, 757 (4 Cir. 1961); see also Krotkoff v. Goucher College, 585 F.2d 675 (4 Cir. 1978); Walker Mfg. Co. v. Dickerson, Inc., 560 F.2d 1184, 1188 (4 Cir. 1977). Consequently, it was appropriate for the district court in this case to consider the evidence presented without straining to find inferences supporting the plaintiffs' position in every shred produced.
 
 III.
 
 8
 On appeal plaintiffs have limited their allegations of discrimination to the issues of sabbatical leave, promotions and compensation. Plaintiffs failed to introduce any evidence that Professor Bright ever applied for sabbatical leave, much less suffered discrimination from its denial. Professor Kim applied for two sabbatical leaves during his tenure at Coppin State. He was granted such leave in 1966-67, and he was denied leave in 1976-77. He testified that he was entitled to the leave, but was unable to demonstrate that anyone else received leave that year, and if so, that the denial of leave to him was discriminatory. The college maintained at trial that it did not grant any sabbatical leaves in 1976-77 because it needed its full complement of staff during an accreditation review conducted that year.
 
 
 9
 On appeal plaintiffs point to an exhibit introduced by defendants that indicates that Professor Leroy Fitzgerald, a black, received an "HEW fellowship" in 1977. The references to this fellowship in the exhibit are cursory; it is difficult to draw even an inference that Professor Fitzgerald was excused from his teaching responsibilities during 1976-77 as a result. Indeed, Professor Kim's own testimony distinguished the various forms of leave available, including sabbatical leave, which entailed compensation by the college at one-half salary during the period, and a "study leave" "funded by the Title III program." Although plaintiffs failed to develop this issue at trial, it is apparent that the Title III leave referred to by Professor Kim stems from Title III of the Higher Education Act of 1965, 20 U.S.C. § 1051 et seq. (1976), under which the former Department of Health, Education and Welfare (HEW) provided fellowships to faculty members at institutions like Coppin State for both teaching and research. 20 U.S.C. § 1054.
 
 
 10
 We think this evidence amply supports a finding of no discrimination under Title VII of the Civil Rights Act of 1964 and a directed verdict on the §§ 1981 and 1983 claims. Plaintiffs simply failed to adduce sufficient evidence that discrimination played any role in the denial of Professor Kim's sabbatical leave in 1976-77. Even assuming Professor Fitzgerald received leave in that year, the leave taken was not sabbatical leave, but rather leave fully funded by the federal government. In addition, it is by no means clear on this record that Professor Fitzgerald's "HEW fellowship" interrupted his teaching duties, because the HEW program provides fellowships for teaching as well as research. In any event, Professor Fitzgerald's leave could not represent improper discriminatory preference by the college for a black over an Asian because HEW, not the college, selected Professor Fitzgerald for the fellowship and paid for it.
 
 
 11
 On the issue of promotions, Professor Kim had already received tenure prior to the period in question. Professor Bright, however, applied several times for promotion to full professor during the period but was denied promotion each time. He concedes that no one was promoted the first year he was eligible, 1974-75. In 1975-76, for some reason his application was not considered. It is therefore uncontroverted that President Burnett did not personally review his application that year, and for purposes of Title VII the record supports the district court's finding that the failure to consider the application was not discriminatory. The record similarly supports the district court's findings of no discrimination for the years 1976-77 and 1977-78, when Professor Bright's application did receive consideration but was nonetheless disapproved prior to review by President Burnett.
 
 
 12
 The only remaining question concerns Professor Bright's application for promotion in 1978-79, which President Burnett did personally review. In that year, it is uncontroverted that the college could promote only three individuals. President Burnett appointed Dr. Nancy Wilkey to one of the positions because of a need for a maternal care specialist in order to maintain the accreditation of Coppin State's nursing school, a need plaintiffs do not contest. It is also uncontroverted that President Burnett selected the number one rated candidates from the Arts and Sciences and Education groups to fill the other two positions.
 
 
 13
 Professor Edward Sommerfeldt was rated number one in Arts and Sciences over Professor Bright, who received the number two rating. Professor Sommerfeldt had more teaching experience than Professor Bright, a more extensive publication record, and was qualified in the fields of physics and computer science, fields in which plaintiffs do not contest the college's need. Sommerfeldt, moreover, is white. A finding of no discrimination in the college's preference for Sommerfeldt over Bright is manifestly correct.
 
 
 14
 Plaintiffs nonetheless argue that Professor Bright should have been promoted instead of Professor Leroy Fitzgerald, despite the fact that Professor Fitzgerald was evaluated independently of Professor Bright in the Education group, which rated Fitzgerald number one. Professor Fitzgerald also had a more extensive publication record than Professor Bright, had served as Dean of Graduate Studies, a much more significant administrative position than any held by Bright, and most importantly, had demonstrated a singular talent for attracting federal, state and other grants to the college. We think there is no genuine issue of material fact that Professor Fitzgerald was at least as qualified if not more qualified than Professor Bright was for purposes of promotion to full professor. The district court found that the only evidence in the case was that Professor Fitzgerald was promoted over Professor Bright solely on the grounds of merit. We agree that the record points inescapably to this conclusion. Thus, the record fully supports the district court's finding of no discrimination under Title VII in the college's promotion policy, and its decision that no reasonable jury could find discrimination in violation of §§ 1981 and 1983.
 
 IV.
 
 15
 Plaintiffs advance two major contentions with respect to the alleged discrimination practiced by the college in establishing their compensation. First, they assert that they were unjustifiably paid among the lowest salaries at the college, particularly in view of their credentials, since the time Professor Bright joined the faculty in 1969 and Kim became full professor in 1970. The district court ruled that the "continuing impact" of this alleged discrimination did not defeat the bar of the statute of limitations for college actions taken prior to 1974, citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Evans, however, held that a United flight attendant was not entitled to retroactive seniority for a past act of discrimination when she had departed United for an interval. This court, in contrast, has consistently distinguished Evans when the discriminatory employment practice has continuously affected the complaining employees and is continuing. E. g., Jenkins v. Home Ins. Co., 635 F.2d 310, 311-12 (4 Cir. 1980) (compensation); Patterson v. American Tobacco Co., 586 F.2d 300, 304-05 (4 Cir. 1978), after remand, 634 F.2d 744, 750-51 (4 Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 3078, 69 L.Ed.2d 951 (1981). Plaintiffs here have not conclusively proven continuing disparity in their salaries vis-a-vis the black faculty at the college, but they have produced sufficient evidence to raise a genuine issue for a jury's ultimate determination under §§ 1981 and 1983 and for reconsideration of the issue by the district court under Title VII.
 
 
 16
 The district court considered plaintiffs' contention that they were singled out in the denial of an equalization pay increase granted to most Coppin State professors in 1974. Professors Kim and Bright each received their cost-of-living salary increase that year, but did not receive, along with one black professor, an additional increase of approximately equal size distributed out of surplus funds. The district court found that the college had demonstrated legitimate, nondiscriminatory reasons for denying the increase that were not mere pretexts. The court relied on evidence that suggested that plaintiffs had been uncooperative in the college's efforts to secure a National Science Foundation grant, that they had participated in and perhaps encouraged a student boycott at the school and that they were generally uncooperative with the college administration.
 
 
 17
 We think that a finding of no discrimination on this issue pursuant to Title VII was not clearly erroneous. As the trier of fact, the district court was entitled to conclude that plaintiffs' general lack of cooperation with the college administration during this period impelled President Burnett to deny the equalization increases without the taint of discriminatory motive. Although the district court improperly considered evidence of Professor Kim's administrative failings that actually occurred in 1977, and was thus irrelevant to the 1974 decision,[3] the district court was entitled to credit defendants' account of the dispute between Kim and Bright and the college administration over the preparation and administration of a proposed National Science Foundation grant in 1972-73.[4] In addition, the district court was entitled to credit President Burnett's opinion that plaintiffs had participated in the student boycott; this rationale for his action does not raise any issue of racial discrimination. This resolution of plaintiffs' statutory claims pursuant to Title VII does not, however, necessarily apply to their constitutional claims under §§ 1981 and 1983.
 
 
 18
 The district court conceded that the issue of the National Science Foundation grant was "hotly contested." Plaintiffs' basic contention was that the college administration assigned the preparation and administration of the grant to others for racial reasons. The jury was entitled to decide, so they argue, whether President Burnett was racially biased or whether plaintiffs improperly failed to cooperate with the administration on the grant, thus endangering it and justifying their replacement and the subsequent denial of the pay increase. This material fact still very much at issue, coupled with the improper consideration of evidence concerning events in 1977, suffices to render the directed verdict on this compensation issue improper.
 
 
 19
 The denial of the pay increase, moreover, raises an additional constitutional claim in addition to that of racial discrimination. President Burnett testified that he denied the pay increase in part because of plaintiffs' participation in a student boycott that occurred at the college in 1974. If we assume that the expression involved was constitutionally protected by the first amendment, there can be no doubt that the expression was a "substantial or motivating factor" in Burnett's adverse employment action, see Mt. Healthy City Board of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and it is likely that he would not have denied the increase "but for" the protected expression by plaintiffs, Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). Plaintiffs would accordingly be entitled to relief for the college's unconstitutional infringement of their rights to free expression through the punishment meted out under the doctrine enunciated by the Supreme Court in these cases.
 
 
 20
 The district court, however, summarily dismissed the idea that Professors Kim and Bright engaged in constitutionally protected expression. It stated: "Needless to say, joining a picket line and participating in a boycott is highly disruptive to the educational process," citing Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Such disruption justified President Burnett's denial of the pay increase in its view, and apparently precluded consideration of their activity by the jury.
 
 
 21
 We have not decided the issue of whether the expression of a public employee is constitutionally protected should be determined by the court or by the jury. See Cooper v. Johnson, 590 F.2d 559 (4 Cir. 1979). Other courts, however, have held that the ultimate question of whether expression is protected is for the court, recognizing, however, the substantial role of the jury in finding facts necessary to strike the balance mandated in Pickering. Van Ooteghem v. Gray, 628 F.2d 488 (5 Cir. 1980), reh'g granted, 640 F.2d 12 (5 Cir.), cert. dismissed, --- U.S. ----, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981); accord, Schneider v. City of Atlanta, 628 F.2d 915 (5 Cir. 1980); see Tygrett v. Barry, 627 F.2d 1279, 1287 (D.C.Cir.1980); Hickman v. Valley Board of Educ., 619 F.2d 606, 609-10 (6 Cir. 1980). We think that the extent of protection afforded by the first amendment to expression is ultimately a question of law for the courts, but that the jury's function is to find the underlying facts to which the legal standard is ultimately applied. This division of responsibility, in our view, stems from the reasoning of Pickering.
 
 
 22
 In Pickering, the Court recognized both the substantial interest of government in regulating the conduct of its employees and the rights of public employees to comment on matters of public interest, rights guaranteed by the first amendment and not forfeited by the mere fact of their government employment. In consequence, it stated, "(t)he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734-35. The Court recognized legitimate government interests in maintaining discipline by immediate superiors, harmony among coworkers, personal loyalty and confidence necessary to close working relationships and preventing disruption of government operations. Id. at 569-71, 88 S.Ct. at 1735-36. On the other hand, the Court recognized the strong interest of the employee and indeed the public in "having free and unhindered debate on matters of public importance." Id. at 573, 88 S.Ct. at 1737.
 
 
 23
 Moreover, in analyzing expression by teachers, the Court has frequently reiterated the country's deep commitment to safeguarding academic freedom, "which is of transcendent value to us all and not merely to the teachers concerned." Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). As the Court stated in Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957):
 
 
 24
 The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.
 
 
 25
 354 U.S. at 250, 77 S.Ct. at 1211-12 (opinion of Warren, C.J.). Not only is academic freedom fundamental to freedom of expression under the first amendment, but freedom of expression is likewise fundamental to academic freedom.
 
 
 26
 First amendment values should find their purest realization in our schools and universities. The creators of the American nation were profoundly influenced by Locke and the British empiricists, who propounded the philosophical principles of knowledge based on demonstration and measured reflection, not blind faith, a knowledge secured by probability, not certainty, and the essential check of doubt on all propositions. See, e. g., J. Locke, Essay Concerning Human Understanding (1690). Scepticism goads the mind to further inquiry, and through this relentless process western civilization has advanced. We celebrate Galileo, not only for his discoveries, but for his courage in the face of persecution for his intellectual beliefs. Such old religious shackles that imprisoned scholarship impelled many of the first settlers of this land to leave their homes for a new life of freedom here. It was in the nature of our disparate colonial development that the "free trade in ideas"[5] began to flourish, culminating in the Revolution that would bind thirteen minor states with the common fiber of dedication to the principle of the sovereignty of each individual.[6]
 
 
 27
 We rely on our educational institutions to develop that individual sovereignty, and it can only be attained by encouraging the individual to think independently. Independent thinking, in turn, can only be developed through constant questioning, the expression of new, untried and heterodox beliefs and the willingness to tolerate experimentation-in sum, the traditions upon which the first amendment rests. It follows that our schools, particularly our universities, must serve as great bazaars of ideas where the heavy hand of regulation has little place. Like other bazaars, they may seem rude, cacophonous, even distasteful at times; but they are necessary predicates to the more orderly market of ideas in our public life. See Wieman v. Updegraff, 344 U.S. 183, 194, 73 S.Ct. 215, 220, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring).[7]
 
 
 28
 It is against this background that the Supreme Court struck the balance in Pickering. The Court rejected the school board's statements that the teacher's expression was "detrimental to the efficient operation and administration of the schools of the district," and was "disruptive of faculty discipline," tending to foster "controversy, conflict and dissension" among faculty, school officials and citizens. 391 U.S. at 564, 567, 88 S.Ct. at 1732, 1734. The Court found the teacher's expression protected by the first amendment, even if defamatory,[8] because "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Id. at 574-75, 88 S.Ct. at 1737-38. The Court thus designed its approach in order to protect freedom of expression vigorously, balanced by an objective consideration of the state's interest in efficient public service. The approach protects the employee from the quite subjective ire of superiors over expression they do not approve of.
 
 
 29
 It is fitting, therefore, for the jury to weigh the factors of disruption of operations, disharmony among coworkers or breach of a confidential working relationship enumerated by the Court in Pickering. These are matters of fact for which the jury is uniquely equipped to filter out self-serving claims and apply its judgment based on individual experience and an assessment of the credibility of the disputants. E. g., McGill v. Board of Educ. of Pekin Elem. School, 602 F.2d 774, 776-77 (7 Cir. 1979).
 
 
 30
 On the other hand, the court must ultimately determine whether the first amendment protects the expression involved. See Brown v. Bullard Independent School Dist., 640 F.2d 651, 653 (5 Cir. 1981); Williams v. Board of Regents, 629 F.2d 993, 1002-04 (5 Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981); Columbus Educ. Ass'n v. Columbus City School Dist., 623 F.2d 1155, 1159-60 (6 Cir. 1980). The courts are entrusted with this part of the Pickering balance not only because of the importance of legal questions in reaching the determination but because of the traditional role of the courts in safeguarding expression, however unpopular, from the antagonism of majority views.
 
 
 31
 In applying the Pickering analysis to this case, we note at the outset that the activity engaged in by Professors Kim and Bright is within the ambit of the first amendment. Professor Bright spoke to students about their boycott and allegedly offered them counsel. It is nowhere alleged that he incited them to boycott or encouraged them to engage in disorderly conduct. It is likewise nowhere alleged that any criticism expressed was directed personally at coworkers or college administrators rather than at problems of the institution generally. Compare Bickel v. Burkhart, 632 F.2d 1251, 1256-58 (5 Cir. 1980) (institutional criticism) with Smalley v. Eatonville, 640 F.2d 765, 768 (5 Cir. 1981) (personal charges against mayor expressed by his finance director). It was alleged that Professor Kim simply joined a student picket line. The first amendment clearly protects picketing, subject to reasonable time, place and manner restrictions; the message of the expressive conduct involved, however, cannot be regulated. Police Dep't v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Expressive conduct is protected on school grounds so long as it does not materially and substantially interfere with school activities. Tinker v. Des Moines Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Thus quiet and peaceful picketing on school grounds is generally protected by the first amendment, but noisy demonstrations may be prohibited. Grayned v. City of Rockford, 408 U.S. 104, 118-20, 92 S.Ct. 2294, 2304-05, 33 L.Ed.2d 222 (1972).
 
 
 32
 The district court in this case assumed that the picketing was disruptive and thus not protected expression. The student boycott in its entirety was certainly disruptive of school activities. Under Pickering, however, the disruption of operations and disharmony in the workplace allegedly caused by the employee's expression must be assessed by the jury. A substantial issue of material fact remains in this case as to whether the involvement of Professors Kim and Bright in the boycott actually resulted in disruption of school activities. An objective evaluation of the actual harm caused, not perceived or potential harms, is required. Against whatever disruption the jury finds the court must balance the importance of the message Professors Kim and Bright sought to express. Pickering's public criticisms of the school board no doubt caused some disruption, but the Court held that the public interest in his message and his interest under the first amendment were overriding concerns. As the Court of Appeals for the Fifth Circuit recently noted, "We do not read (Pickering-type cases) as establishing disruption and disharmony as a per se defense to dismissal no matter how egregious the complained of conduct of the superior might have been." Williams v. Board of Regents, 629 F.2d at 1004. See Tygrett v. Barry, 627 F.2d at 1286-87; Columbus Educ. Ass'n v. Columbus City School Dist., 623 F.2d at 1159-60.
 
 
 33
 We therefore think the directed verdict for defendants on this issue was inappropriate. Our conclusion is supported by the decisions in other circuits. The Court of Appeals for the Fifth Circuit reversed a district court's judgment notwithstanding the verdict predicated on the material and substantial disruption of the university's program caused by a professor's criticism of the program expressed to state officials. The court of appeals held that no actual harm had been demonstrated and reinstated the jury verdict in the professor's favor. D'Andrea v. Adams, 626 F.2d 469, 474-76 (5 Cir. 1980). The Court of Appeals for the Sixth Circuit has ruled that a district court improperly removed the issue of whether the university administration had denied tenure to a professor in retaliation for the exercise of his first amendment rights. Hildebrand v. Board of Trustees, 607 F.2d 705 (6 Cir. 1979). In addition, the overwhelming weight of authority holds summary judgment inappropriate in Pickering cases.[9] We therefore think that a jury should decide whether plaintiffs' involvement in the student boycott materially impaired the operation of the college or their working relationships there, and if not, whether President Burnett would not have withheld their equalization pay increases but for the exercise of their first amendment rights.
 
 V.
 
 34
 Plaintiffs' other contentions on this appeal lack merit. They object to the district court's refusal to permit the introduction into evidence of a community newspaper, Good News, in which the college had placed some advertisements. The newspaper in question contained highly inflammatory racial slurs on Baltimore's Korean community. The probative value of this evidence was questionable at best, because of the highly tenuous link between the college and the paper's editorial policy. The unfairly prejudicial nature of this evidence, on the other hand, is manifest. Its introduction could well have confused the issues in the case and misled the jury. The district court therefore properly excluded it under Fed.R.Evid. 403.
 
 
 35
 Plaintiffs also argue that they substantially prevailed in this litigation, entitling them to attorneys' fees under 42 U.S.C. § 1988 (1976), because the college subsequently granted them pay increases. They do not even allege, however, that this increase was extraordinary or that it rendered their total compensation comparable to that of their black colleagues. In view of the sweeping dismissal of all their claims by the district court, an award of attorneys' fees under the circumstances would be clearly inappropriate. Smith v. University of North Carolina, 632 F.2d 316, 352-53 (4 Cir. 1980).
 
 
 36
 We think the district court was largely correct in dismissing the claims of discrimination asserted in this case. Substantial issues of material facts remain, however, on the alleged discrimination in compensation of plaintiffs, so we must vacate the judgment with respect to that issue and remand them for a new trial.
 
 
 37
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 Plaintiffs failed to introduce into evidence in the district court the charges they filed with the EEOC
 
 
 [2]
 The district court ruled that President Burnett's actions alone could be considered pursuant to §§ 1981 and 1983. Plaintiffs have conceded that the college could not be sued under the statutes. The district court correctly held that the actions of President Burnett's subordinates cannot be attributed to him under a theory of respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 691-95, 98 S.Ct. 2018, 2036-38, 56 L.Ed.2d 611 (1978)
 
 
 [3]
 The district court specifically noted that the college encountered difficulty in maintaining its accreditation in an area for which Kim was responsible. The accreditation difficulty and the accompanying administrative complaints against Kim took place in 1977. The administrator who addressed the problem, Dean Freeman Hrabowski, did not join the Coppin State faculty until August 15, 1977
 
 
 [4]
 In 1971, the National Science Foundation encouraged Coppin State and other predominately black colleges to apply for a grant from its College Science Improvement Program (COSIP). Professors Kim and Bright worked on preparation of a grant proposal in the social sciences in 1971 and early 1972. After submitting a first draft of the proposal to the National Science Foundation in February 1972, Professors Kim and Bright became increasingly dissociated from the project. Plaintiffs contend that the college administration, led by President Burnett, wished to have blacks administering the grant, and thus sought to revise the proposal without their participation and eventually remove it from them altogether, assigning it to black faculty members. Defendants argued that plaintiffs unreasonably withheld their cooperation from the revision of the proposal necessary to satisfy National Science Foundation objections. This lack of cooperation allegedly endangered the entire project, causing President Burnett to replace Professors Kim and Bright in the spring of 1973
 
 
 [5]
 Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting):
 But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas,-that the best test of truth is the power of the thought to get itself accepted in the competition of the market; and that truth is the only ground upon which their wishes safely can be carried out. That, at any rate, is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year, if not every day, we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country.
 
 
 [6]
 Justice Brandeis expounded on the importance of the philosophy of the first amendment to the Revolution in Whitney v. California, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring):
 Those who won our independence believed that the final end of the state was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to be the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.
 
 
 [7]
 Justice Frankfurter wrote:
 To regard teachers-in our educational system, from the primary grades to the university-as the priests of our democracy is therefore not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. Teachers must fulfill their function by precept and practice, by the very atmosphere which they generate; they must be exemplars of open-mindedness and free inquiry. They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them. They must have the freedom of responsible inquiry, by thought and action, into the meaning of social and economic ideas, into the checkered history of social and economic dogma. They must be free to sift evanescent doctrine, qualified by time and circumstance, from that restless enduring process of extending the bounds of understanding and wisdom, to assure which the freedoms of thought, of speech, of inquiry, of worship are guaranteed by the Constitution of the United States against infraction by national or State government.
 344 U.S. at 196-97, 73 S.Ct. at 221 (Frankfurter, J., concurring).
 
 
 [8]
 The Court limited the permissible defamation to that tolerated under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny, that is, defamation without actual malice
 
 
 [9]
 E. g., Owens v. Rush, 654 F.2d 1370 (10 Cir. 1981); Nathanson v. United States, 630 F.2d 1260, 1262-64 (8 Cir. 1980); Swilley v. Alexander, 629 F.2d 1018, 1020-21 (5 Cir. 1980); Hanson v. Hoffman, 628 F.2d 42, 49-52 (D.C.Cir.1980); Yoggerst v. Stewart, 623 F.2d 35, 39-41 (7 Cir. 1980); Aebisher v. Ryan, 622 F.2d 651, 655 (2 Cir. 1980); Haimowitz v. University of Nevada, 579 F.2d 526, 530 (9 Cir. 1978); see Trotman v. Board of Trustees, 635 F.2d 216 (3 Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981)