David NEUBAUER, Plaintiff-Appellee,

v.

CITY OF McALLEN, TEXAS, Calvin Gibson, C.D. Mussey, and Frank Jurek, Defendants-Appellants.

No. 83–2553.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1985.

Eduardo Roberto Rodriguez, Brownsville, Tex., for city of McAllen, et al.

Henrichson-Smith, Preston Henrichson, George Almaraz, Richard C. Smith, Edinburg, Tex., Russell McMains, Corpus Christi, Tex., for plaintiff-appellee.

Before THORNBERRY, GARWOOD, and HILL, Circuit Judges.

GARWOOD, Circuit Judge:

Appellee David Neubauer, a former police patrol officer with the McAllen police

department, brought this suit under 42 U.S.C. § 1983, alleging that the city manager, chief of police, and members of a Police Review Board for the City of McAllen violated his first amendment rights by dismissing him because of his involvement in constitutionally protected activities. Following a jury verdict, the district court rendered judgment against defendants-appellants, the City, city manager, police chief, and one of the Review Board members. Since the jury's verdict as to each appellant may have been based on a submitted theory of liability not sustained by the evidence, we reverse.

## FACTS AND PROCEEDINGS BELOW

Plaintiff-appellee Neubauer contended that his March 29, 1979 discharge from the McAllen police department violated his first amendment rights because it was motivated by his February 1979 furnishing of a statement to the state grand jury concerning an incident of July 17, 1978 involving fellow police officer Sergeant Davis, thus breaching an alleged unwritten police "code of silence." Neubauer alleged that his discharge was additionally violative of his first amendment rights because it was also motivated by his association with those who supported the McAllen civil service referendum and by his participation in or support of a police officer's employee organization known as the Combined Law Enforcement Association of Texas ("CLEAT").

The McAllen civil service referendum election was held on August 12, 1978. The hotly contested and controversial campaign for civil service had been organized by McAllen fire department personnel, but CLEAT became active in support of the referendum in its later stages. The mayor and city commission opposed the measure. McAllen Police Lieutenant DeLeon was president of CLEAT. Neubauer joined CLEAT in either October 1978 or January 1979, well after the election. There is no evidence that Neubauer played any role in

CLEAT, other than being a member; nor is there any evidence of whether Neubauer was even minimally involved in the civil service referendum campaign or what his position was regarding that matter.

The referenced incident of July 17, 1978 involved improper advances allegedly made by Sergeant Davis to an undocumented alien female prisoner who was being held in the jail portion of the McAllen police station. This incident, as well apparently as other matters, some possibly of a similar nature, concerning the City of McAllen and its police department, came under consideration by the state grand jury in Hidalgo County. Several police officers appeared before the grand jury, including DeLeon who appeared in December 1978 and January 1979. According to DeLeon, on the latter occasion the grand jury requested that he procure for it statements from those involved in the July 17 incident. DeLeon was not involved in and did not witness this incident. Neubauer was requested by DeLeon, or by Patrol Officer Escalon, who witnessed the July 17 incident, to furnish a written statement for this purpose. In early February 1979, Neubauer executed an affidavit concerning the July 17 incident and either gave it to Escalon or put it in DeLeon's office. Apparently the affidavit was forwarded to the grand jury. At some time after March 27, 1979, the exact date being undisclosed by the record, Neubauer personally testified before the grand jury.

After the grand jury investigation had begun, defendant-appellant Calvin Gibson, the city manager of McAllen, ordered defendant-appellant Police Chief Mussey to organize an internal department investigation into the allegations against Sergeant Davis. Mussey directed defendant-appellant Jurek, a police commander, and another officer, Williams, to conduct an initial investigation into the matter. The two men gathered statements from various witnesses and presented them to the police chief. Mussey then set up a Police Review

Board composed of three police commanders, Jurek, Eckhart, and Funke, to conduct a more thorough investigation. Neubauer presented to this Board a Xerox copy of the entire affidavit, except for the jurat, which he earlier furnished for the grand jury. He informed the Board that the statement was a copy of what he had furnished the grand jury. The Board subsequently discovered that Neubauer's statement was factually incorrect in at least one or more respects. The statement asserted that Alfredo Saldana, a police officer, had witnessed the July 17 incident; in fact, Saldana had been on vacation from July 7 to July 23, and could not have been present during the incident.[1] The Board called Neubauer in for an interview, during which the members called his attention to the records which indicated that his statement about Saldana and his own assignment on that occasion was wrong, and provided him an opportunity to correct the errors in the statement. Neubauer, however, refused to alter his statement. He persisted in this refusal on a subsequent occasion. He did

1. In Neubauer's statement, the following forms a part of his description of the July 17 incident:

"In the meantime Officer Saldana # 57 came into the Police Department to do some unfinished paperwork. Upon making contact with Officer Escalon, Officer Saldana was told about the two female 1095's just arrested. Upon hearing this Officer Saldana went back to the female 1095's cell to get a better look. While Officer Saldana was enroute to the cell, I observed telecon operator Moreno, over camera, leave the cell area alone. I then became suspicious as to the goings on back in the cell. I walked back to the cell area and overheard Officer Saldana stating to Sgt. Davis that they better leave before he (Sgt. Davis) gets into trouble. I then observed both of them leave the cell area. I followed them to the report room."

Saldana testified he was not at the police station on this occasion, as he was on vacation from July 7 to July 23, which was also reflected by the police department records. Saldana testified that when he learned Neubauer was preparing a statement about the July 17 incident, he told him he was not present and should not be so shown in the statement. Neubauer admitted Saldana told him he was not there. Saldana also testified that he and Neubauer had been present on two other occasions involving similar conduct by Davis with other female prisoners. However, in his testimony, Neubauer did not claim that he confused this incident with one of those others.

The Board also concluded that Neubauer's statement incorrectly placed him on radio duty that night, when in fact he had been in his patrol car when at least some of the events he described took place. The statement says that "[o]n the 17th day of July 1978, at approximately 2:00 to 4:00 a.m., I David Neubauer # 78 was assigned to desk duty." The statement goes on to relate what Neubauer observed while he was on desk duty (and while walking from there to the cell area). Police records show that on the 10:00 p.m. to 6:00 a.m. "shift" in question, Neubauer was not assigned to desk duty, but to a patrol car; and the radio log shows him in his patrol car at various locations outside of the police station, including at 2:24 a.m., 3:08 a.m., 3:28 a.m., and 4:14 a.m., returning to the station at 4:38 a.m. The logs show the females were brought to the jail for booking by Davis and Escalon at 2:36 a.m. Neubauer testified his handwriting was on some of the earlier radio logs, indicating he had been in and out of the station and had temporarily relieved the radio operator. The statement, however, does not reflect that he was assigned to patrol duty, or was in and out of the station. Neubauer admitted at trial he "very well could have" been mistaken about his assignment. Escalon testified that Neubauer was present assisting, as a patrol officer, when the females were arrested shortly before 2:30 a.m., came to the police station when they were brought in, was present during some of the incident, but was on patrol assignment and not "working the desk at the time." Other evidence also convincingly showed that Neubauer was present during at least some of the incident.

The Board also considered that some of the things the statement indicates Neubauer personally saw or heard could not have been, or were not, actually observed or heard by him. There was evidence both ways as to some of these items, and as to others, Neubauer in essence admitted that his statement was based on assumptions or conclusions, rather than actual personal observation or hearing.

Davis admitted that he had tried to "flirt" with one of the arrested females, but claimed it was all in jest, and there was some evidential support for this theory. Other evidence, however, indicated he was serious and persistent in his verbal advances. No actual physical contact was made. Davis received a loss of a week's vacation and a reprimand. There was evidence that Saldana, Escalon, and Neubauer resented Davis' having been promoted "over" them, and that Escalon and Saldana resented a prior occasion on which Davis had disciplined them.

Escalon translated Davis' comments to the female prisoner (who spoke only Spanish, which Davis did not speak) and was the individual who initiated the complaints about Davis.

not acknowledge that he may have been mistaken.

The Board subsequently recommended to Chief Mussey, on March 27, 1979, that Neubauer be fired for presenting a false statement to a superior officer. Mussey examined the Board's findings and concurred in their recommendation. He submitted the Board's and his recommendations to the city manager, Gibson, for a final decision. Gibson agreed with the recommendations and fired appellee on March 29, 1979.

Neubauer thereafter submitted a grievance to the assistant city manager, Jose Escamilla, requesting that he review the city manager's decision. Escamilla met with Neubauer and Frank Jurek, of the Police Review Board, and examined the file of information that had accumulated during the recommendation and dismissal process. On April 10, 1979, Escamilla sent a letter to Neubauer informing him that he concurred in the decision to terminate his employment. Neubauer took his grievance to the City of McAllen Grievance Committee, composed of three city employees who had been elected to Committee positions by their fellow employees. None were employed in the police department. The Committee was the penultimate step in the City's grievance procedure; the City's *Personnel Policies and Procedures* manual provided that the Committee would make a decision on the employee's grievance and submit it to the city manager, who would then make a "final decision." The Committee held a hearing on May 2, 1979, during which it heard testimony from both Neubauer and the City and reviewed documents submitted by the Board. Neubauer was represented by counsel at this proceeding. At the conclusion of the hearing, the Committee deliberated briefly and concurred in the decision to fire Neubauer. The Committee unanimously found Neubauer's statement to be "untruthful" and "recommend[ed] termination from employ-

ment." The city manager adhered to his original decision.

On October 9, 1980, Neubauer brought this action under 42 U.S.C. § 1983 against the City, Gibson, Mussey, and the individual members of the Police Review Board, alleging that they conspired to terminate his employment because he exercised his first amendment rights.[2] He contended that the defendants were motivated to fire him because of his association with DeLeon and others who supported the civil service referendum, his violation of the unwritten "code of silence" by furnishing an affidavit to the state grand jury concerning the Davis incident, and his participation in or support of CLEAT. The case was tried to a jury in November 1982. The jury returned a special verdict which found that one or more of Neubauer's referenced three protected activities set out in the court's charge had been a substantial motivating factor in each defendant's decision to recommend or order termination, that appellee would not have been fired but for his involvement in one or more of those protected activities, and that he suffered $539,242.25 in past and future lost earnings and in mental pain and anguish. The verdict did not indicate *which* one or more of the three "activities" of Neubauer had motivated the defendants, however. The jury also assessed punitive damages of $3,000 each against Gibson, Mussey, and Jurek. The district court rendered judgment for Neubauer in the amount of $615,620.13, consisting of $539,242.25 actual damages against the City, $3,000 punitive (but no actual) damages against Gibson, Mussey, and Jurek each, and $67,377.88 attorneys' fees and court costs assessed against all defendants.

The basic determination of liability as to all defendants rested on the jury's answer to the first interrogatory, reading as follows:

"Do you find from a preponderance of the evidence that *any one or combina-*

---

2. Neubauer also claimed his termination deprived him of liberty and property without his being afforded procedural due process. These claims were severed by the district court.

*tion* of the following activities of David Neubauer, *individually or together* with one another, were a substantial motivating factor in the decision of the persons below named to discharge Mr. Neubauer from his position as a Police Officer with the McAllen Police Department?

"The activities are:

"a. His association with Ruben de Leon or others who supported the Civil Service Referendum; and/or

"b. For making written or oral statements which were substantially true or which in good faith he so believed to be true; and/or

"c. For his participation in or support of a police officer's association.

"ANSWER:

"As to:

| | |
|---|---|
| "Calvin Gibson, Defendant. | Yes ___ No ___ |
| "C.D. Mussey, Defendant. | Yes ___ No ___ |
| "Frank Jurek, Defendant. | Yes ___ No ___ |
| "Roy Eckhardt. | Yes ___ No ___ |
| "Fred Funke. | Yes ___ No ___." |

(Emphasis added.)

The jury checked each of the "yes" blanks.[3]

**3.** In its charge, the court read the first sentence of this first interrogatory to the jury, and then stated: "Now, what activities do I ask you about as being substantial motivating factors. There are *three* of them, ladies and gentlemen." (Emphasis added.) After an interruption and re-reading of the first sentence of the first interrogatory, the court then went on in its charge to say:

"In other words, were *any one* of these things a substantial motivating factor in a decision to fire Mr. Neubauer? One, or (a) as I have it listed here, 'His association with Ruben De Leon or others who supported the Civil Service referendum and/or (b) for making written or oral statements which were substantially true or which in good faith he so believed to be true and (c) for his participation in or support of a police officers' association.'" (Emphasis added.)

**4.** Defense counsel objected at trial to the inclusion in the first interrogatory of the activity described in part (a) thereof (Neubauer's "association with Ruben De Leon or others who supported the Civil Service referendum"), on the ground that there was no evidence to support a finding that such activity motivated the decision to discharge Neubauer. Defense counsel also moved for a new trial on the ground that there was no evidence to support a finding either that Neubauer's association with DeLeon or others

## LIABILITY DETERMINATION

The defendants-appellants argue that there was insufficient evidence to support submission of activities (a) and (c) contained in that first interrogatory. They further argue that because of the district court's failure to require separate responses for each activity listed in that interrogatory, it cannot be determined whether the jury based its affirmative answer to the liability issue on those factors which are unsupported by adequate evidence. Appellants have adequately preserved this contention as to activity (a) (concerning Neubauer's association with DeLeon or others who supported the civil service referendum).[4] Appellants do not contend that there is insufficient evidence to support an affirmative finding on activity (b) (concerning Neubauer's written and oral statements) of the first interrogatory.[5] For the reasons stated in more detail below, we hold that the judgment against appellants cannot stand in the absence of sufficient evidence supporting each of the three theo-

who supported the civil service referendum (part (a) of the first interrogatory), or that his participation in or support of the police officer's association (part (c) of the first interrogatory), motivated his discharge, and that since the first interrogatory required an affirmative answer if the jury found that either one of those activities motivated the discharge and it could not be determined whether the jury's answer was based solely on part (a) or solely on part (c), it therefore could not be determined whether the jury's finding against the defendants was based on a submitted theory which lacked the necessary evidentiary support. Accordingly, we believe this issue is properly preserved for appellate review, certainly as to the sufficiency of the evidence to support the submission of part (a) of the first interrogatory. *See Wells v. Hico Independent School District*, 736 F.2d 243, 251–52 (5th Cir.1984). Appellee does not contend that this matter is not properly preserved.

**5.** Appellants do contend that activity (b) is not a proper predicate for liability as it encompasses matters which, under *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), are not protected by the first amendment against adverse employment action by a governmental employer. But no proper objection was preserved to this aspect of the interrogatory, and in any case it is certainly broad enough to encompass furnishing truthful information to the

ries of liability submitted in the first interrogatory, and that, under the standard of *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir.1969), there is insufficient evidence as to each defendant to support an affirmative finding as to activity (a) (Neubauer's association with DeLeon or others who supported the civil service referendum), as to which appellants have properly preserved their complaint.[6] We accordingly reverse and remand for a new trial as to all appellants.

**The City**

We find that the city manager, Gibson, was the only official whose actions may be attributed to the City of McAllen for purposes of section 1983 liability. We also find that there was insufficient evidence to support a finding that Gibson had been motivated by Neubauer's activities described in subdivision (a) of the first interrogatory when he fired appellee. Therefore, we reverse the judgment against the City and remand for a new trial.

In *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court rejected *respondeat superior* as a basis for municipal liability under section 1983. 98 S.Ct. at 2036–37; *see Bennett v. City of Slidell*, 728 F.2d 762, 766 (en banc), *modified*, 735 F.2d 861 (5th Cir.1984) (en banc) (per curiam), *cert. denied*, —— U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). "Instead, it is when execution of a government's *policy or custom*, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent *official policy*, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 98 S.Ct. at 2037–38 (emphasis added). In *Bennett*, we held that policy will be attributed to a city for purposes of section 1983 liability "where the policy was made by an official to whom the governing body had given policymaking authority." 728 F.2d at 769; *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam), *rev'd on other grounds*, 739 F.2d 993 (5th Cir.1984) (en banc). "The governing body must expressly or impliedly acknowledge that the agent ... *acts in lieu of the governing body* to set goals and to structure and design the area of the delegated responsibility...." *Bennett*, 728 F.2d at 769 (emphasis added). A "decision that is officially adopted and promulgated" by such an agent constitutes "official policy" for which the city may be held liable. *Webster v. City of Houston*, 735 F.2d at 841; *Bennett*, 735 F.2d at 862.

■ We find that the city manager of the City of McAllen, Calvin Gibson, was the only official who possessed policymaking power in termination proceedings sufficient to hold the City accountable under section 1983. The *McAllen Code* designates the city manager as "the administrative head of the municipal government," and empowers the city manager to "appoint or remove all subordinate employees." The code provides that the city manager must seek the advice of the city commission before ap-

---

grand jury concerning a matter that body was properly investigating, and such an activity would, at least absent unusual circumstances, be a matter of public concern and not within the class of unprotected activities dealt with by *Connick*.

**6.** *See supra* note 4.

Neubauer contends that activities (a) and (c) (concerning his participation in or support of CLEAT) should be considered as one and the same, pointing out that DeLeon was involved in both. We reject this contention. They were submitted as separate and distinct activities to the jury, which was told there were three activi-

ties, each in a different subdivision of the interrogatory, any one of which would suffice for a "yes" answer. Moreover, association with De-Leon was not necessary to a "yes" answer as to activity (a) for it stated "De Leon *or others who supported* the Civil Service referendum" (emphasis added); the "others" would, of course, include some firemen, persons not employed by the City, police officers who were not members of CLEAT, and others who supported the civil service referendum, but would not include CLEAT members who did not support the referendum (there being no suggestion that all did).

pointing or removing department heads, but does not limit his authority with regard to hiring or firing other subordinate employees, such as Neubauer. In addition, the City's *Personnel Policies and Procedures* manual, which was approved by the McAllen city commission, provides, "The City Manager may discharge, transfer, suspend without pay, or reprimand an employee for just cause. The City Manager may delegate *this authority* to department heads." (Emphasis added.) There is no evidence of such delegation as pertinent here. It is clear that the city manager of McAllen acts "in lieu of the governing body" in deciding whether to fire an employee, and that his authority in that area is exclusive.[7] *Bennett,* 728 F.2d at 769.

Since City Manager Gibson was the only city official who possessed policymaking authority with regard to termination decisions, it was necessary for appellee, in order to hold the City liable, to present evidence showing, and to procure a proper finding, that his involvement in constitutionally protected activity was a substantial motivating factor in Gibson's decision to terminate him. At least as to activity (a) listed in the first interrogatory, however, appellee has failed to do so.

■ Appellee presented no evidence to support his claim that association with DeLeon or others who supported the civil service referendum was a motivating factor in the city manager's decision to fire him. No evidence, circumstantial or direct, was presented to show that Gibson felt any animosity toward DeLeon or other supporters of the civil service referendum, or toward CLEAT.[8] Neubauer did not join CLEAT until months after the civil service referendum election, and there is no evidence to indicate that he was active in that election, or what his feelings about it were,

---

7. Appellants argue that the termination process was not complete until the city manager's decision had been "appealed" to the Grievance Committee. As support, appellants presented evidence, through a bill of exception, which demonstrated that the city manager had reversed his decision to dismiss employees on two occasions because of recommendations made by the Grievance Committee. Therefore, appellants argue in their brief, the Grievance Committee "had the power to effectively overrule personnel decisions made by the City Manager when these decisions were appealed to it." In this connection, appellants also argue that there was no evidence that the Grievance Committee was motivated by any "improper" consideration, and, further, that no interrogatory was submitted in respect to the Grievance Committee.

We reject appellants' argument. The City's *Personnel Policies and Procedures* manual provides that:

"The grievance committee will investigate and submit its findings and decision to the city manager. The city manager will act, *on his discretion,* on the decision submitted by the grievance committee. A copy of the *final decision* will be given to the employee." (Emphasis added.)

Moreover, although appellants state that the Grievance Committee had the power to "overrule" the city manager's firing decisions, they concede elsewhere in their brief that the Committee had power only to make a "recommendation." We do not believe the two instances cited by appellants where the city manager followed the Committee's recommendation reveal a "persistent, widespread practice" from which we can conclude that the Grievance Committee has policymaking power, *Webster,* 735 F.2d at 841, nor do we find support for this argument in the City's policy manual. Instead, the policy manual reinforces our holding that the city manager had been delegated policymaking authority and that his decision whether to fire an employee constituted "official policy." Finally, Gibson himself testified that he "would not have had to" follow the Committee's recommendation if they had come out differently. He merely would have been prompted to "re-examine[ ] the whole thing."

8. Gibson admitted stating in the summer of 1978 something about the need to get rid of troublemakers, referring to firemen who had called in sick when they were not. There is no evidence this had anything to do with civil service or DeLeon. DeLeon testified that Gibson did not take a public stand on civil service, but, from a conversation with him, "in my opinion he was against it." There is also evidence that Gibson was aware that DeLeon had appeared before the grand jury, but there is no evidence that Gibson had any information or belief that DeLeon's appearance was connected with either the Bob Davis incident or Neubauer. None of this suffices to show hostility to DeLeon or other supporters of civil service (or to CLEAT), nor particularly to Neubauer on account of any such association.

or that Gibson had any information about Neubauer in that connection. More important, appellee failed to present any evidence to show that Gibson *even was aware* of who appellee's associates were (or of his CLEAT membership); the only evidence touching on this issue was Gibson's testimony that he had not known of Neubauer's membership or association when he ordered his dismissal.[9]

■ "It is well settled that a court is not free to instruct a jury on an issue of law on which there is no evidence." *Ware v. Reed,* 709 F.2d 345, 352 (5th Cir.1983); *Wells v. Hico Independent School District,* 736 F.2d 243, 251–52 (5th Cir.1984). *See also Collins v. Metropolitan Life Ins. Co., Inc.,* 729 F.2d 1402, 1405 (11th Cir. 1984) (relying on Fifth Circuit precedents). Where the giving of an instruction has made it possible that the jury *may* have found against a party on a ground for which there was no evidence, the giving of the instruction constitutes reversible error. *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 740, 742 (5th Cir.1980) (giving *res ipsa loquitur* instruction is error where evidence does not provide a "rational" basis for the jury to find the presence of one necessary element of that doctrine; reversal is required because "[a]lthough plaintiff asserted several theories of recovery, and although the *res ipsa loquitur* charge would relate to only one, the jury returned a general verdict in favor of the plaintiff ... we, therefore, do not know on what basis the jury reached its verdict"); *Lyle v. Bently,* 406 F.2d 325, 327–28 (5th Cir.1969)

(where case is submitted on both undue influence and lack of capacity in change of beneficiary, judgment on general verdict for party contesting change must be reversed where there is no evidence of undue influence regardless of "how much evidence there is ... of mental incapacity ... [since] we have no way of knowing on what basis the jury's verdict was founded"); *Vandercook & Son, Inc. v. Thorpe,* 344 F.2d 930 (5th Cir.1965) (where case was submitted on both negligence and implied warranty theories, but there was no evidence of negligence, reversal of judgment on general verdict for plaintiff was required even if the jury could have properly found for plaintiff on the warranty theory alone); *Jackson v. Southern Ry. Co.,* 317 F.2d 532, 537 (5th Cir.), *cert. denied,* 375 U.S. 837, 84 S.Ct. 77, 11 L.Ed.2d 65 (1963). *See also Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983); *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931); *United States v. Beasley,* 585 F.2d 796, 798 (5th Cir.1978) (per curiam), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

In *Stromberg,* the Supreme Court wrote:

"The verdict against the appellant was a general one. It did not *specify* the ground upon which it rested. As there were three purposes set forth in the statute, *and the jury was instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained....* It follows

9. At trial, Gibson testified, "I didn't know Mr. Neubauer" and, further:

"Q Did you ever tell Mr. Neubauer that he shouldn't give a statement or testify before the grand jury?

"A To my knowledge, I have never spoken to Mr. Neubauer.

"Q At the time that you received the recommendation and approved the termination of Mr. Neubauer, were you aware of whether or not he was a member of CLEAT?

"A I did not know Mr. Neubauer, and I did not know if he was a member of CLEAT.

"Q At the time you approved the recommendation to terminate Mr. Neubauer, were you aware whether or not he ran around or associated or socialized with individuals who were members of CLEAT?

"A I did not know his associates, sir.

"Q Did you personally dislike Mr. Neubauer?

"A I did not know Mr. Neubauer, sir." There was no contrary evidence.

that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses ·in question is invalid, under the Federal Constitution, the conviction cannot be upheld." 51 S.Ct. at 535 (emphasis added).

The Court examined the *Stromberg* decision in *Zant v. Stephens,* and stated:

"One rule derived from the *Stromberg* case requires that a general verdict *must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground.* The cases in which this rule has been applied all involved general verdicts based on a record that *left the reviewing court un-*

*certain as to the actual ground on which the jury's decision rested."* 103 S.Ct. at 2745 (emphasis added).

■ Similarly, the district court in the instant case instructed the jury that it was to answer the first interrogatory "yes" as to defendant Gibson if it found that *"any one* of [the three listed activities was] a substantial motivating factor in a decision to fire Mr. Neubauer." The special interrogatory that was submitted to the jury likewise bound the three activities together.

The general submission of the three activities in a single interrogatory leaves this Court wholly unable to determine the actual ground on which the jury's verdict rested. It is possible that the jury's verdict rested *solely* on (a), since it was expressly instructed to answer the interrogatory affirmatively if it found that "any one" of the three listed activities was a factor.[10] Since there was no evidence to support

---

**10.** We distinguish our decision in *Williams v. Maggio,* 679 F.2d 381 (5th Cir.1982) (en banc), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983), and the result obtained by the Supreme Court in *Zant,* which we have quoted in text. In *Williams,* a jury had imposed the death penalty after specifically finding the presence of each of three aggravating circumstances, any one of which justified the punishment the appellant received. 679 F.2d at 387. The appellant challenged the constitutionality of two of the aggravating circumstances, and argued that his death sentence must fall under the *Stromberg* rule. 679 F.2d at 388. In rejecting appellant's argument, we noted:

"The aggravating circumstance of armed robbery-murder was present *and unanimously found by the jury.* Under Louisiana law this means that the two questioned aggravating circumstances are not necessary to entitle the jury to consider imposition of the death penalty. The *extra* findings went to the gravity of his crime, not the jury's power to impose the death penalty.

"Since the *requisite one* aggravating *circumstance* of murder in the course of an armed robbery *is clearly present and was unanimously found by the jury,* the other two circumstances are only material to deciding whether the aggravating and mitigating circumstances weighed together indicate the death penalty should be imposed." 679 F.2d at 389 (emphasis added).

This Court was certain in *Williams* that the jury based its decision on a permissible ground. In this case, however, we are not certain that the jury did not base its decision exclusively on section (a), which would be impermissible grounds for decision. Assuming that submission of sections (b) and (c) of the first interrogatory was supported by sufficient evidence, the jury nevertheless failed to *separately* find that either (b) or (c) (or both) was a motivating factor in the decision to terminate Neubauer.

In *Zant,* the Supreme Court recognized the continuing vitality of the *Stromberg* rule. The Court, however, concluded:

"Th[e *Stromberg* ] rule does not require that respondent's death sentence be vacated, because the jury did not merely return a general verdict stating that it had found at least one aggravating circumstance. The jury expressly found aggravating circumstances that were valid and legally sufficient to support the death penalty." 103 S.Ct. at 2745.

Again, the jury in the instant case *did* return a verdict stating *only* that it had found that *at least one* of the three activities listed was a motivating factor, without any indication of which one(s). Our case would be like *Williams* and *Zant,* rather than *Stromberg* or *Lyle, if* we knew (as, for example, by the form of the verdict or a requirement of the charge) that the jury had found that every one (or (b) or (c) or both) of the three activities was a motivating factor. But such is not the situation here.

submission of this activity (a), we reverse the judgment against the City.

## Individual Defendants

The individual appellants, Gibson, Mussey, and Jurek, argue that the judgments against them cannot be sustained since they necessarily rest on the only finding of basic liability, that under the first interrogatory, which permitted the jury to find that they each had been motivated to dismiss Neubauer on account of his protected activities, even though no evidence had been introduced to support such a finding on activity (a). We agree and reverse the judgment against each individual appellant and remand for another trial.[11]

We have already noted the absence of evidence that Gibson was motivated by activity (a), and this lack of evidence of course requires reversal of the judgment against him individually for the same reason that it requires reversal of the judgment against the City.

■ We also find no evidence in the record to support submission of activity (a), listed in the first interrogatory, as a motivating factor in Jurek's decision to recommend appellee's dismissal. Although Jurek acknowledged that he was aware that appellee "associated with DeLeon" at the time he recommended termination, no evidence was introduced to suggest that Jurek felt animosity toward DeLeon or that he was motivated to recommend Neubauer's dismissal because of that association. Similarly, there was no evidence to suggest that Jurek opposed the civil service referendum. His own testimony revealed that he was neutral on the issue, even though passage of the referendum ultimately would have *benefited* him.[12] Moreover, DeLeon testified that he was unaware of any action by Jurek to discourage CLEAT.[13] Since it is unclear whether the jury's affirmative answer as to Jurek under the first interrogatory was based solely

---

**11.** As noted above, the city manager was the only official who had the authority to fire Neubauer. There was no finding by the jury that the other individual defendants' recommendations *caused* the city manager to dismiss appellee. Absent a finding of cause, it would be unclear whether the individual defendants (other than Gibson) deprived Neubauer of his constitutional rights. *See Reimer v. Smith,* 663 F.2d 1316, 1322 n. 4 (5th Cir.1981) ("It is axiomatic that a plaintiff cannot succeed in a § 1983 action if he fails to demonstrate a causal connection between the state official's alleged wrongful action and his deprivation of life, liberty, or property."); *Bowen v. Watkins,* 669 F.2d 979, 985 (5th Cir.1982) ("Liability under § 1983 requires causation, and a single vote is not a cause when the same decision would have been reached without that vote."); S. Nahmod, *Civil Rights & Civil Liberties Litigation* § 3.15, at 86 (1979) ("[T]he very language of 1983 requires a causal relation between defendant's conduct and plaintiff's constitutional deprivation." (Footnote omitted.)). However, appellants do not appear to dispute that Gibson relied on Mussey's and the Board's recommendations when he ordered Neubauer's dismissal. Gibson testified that he "listened to the[ ] reasons" Mussey and the Board gave for recommending Neubauer's dismissal and that he relied on their judgment and experience when he ordered the termination. No countervailing testimony or evidence was presented. Therefore, we pretermit this question and reach the issue of whether

there was sufficient evidence to support a finding against the individual defendants that activity (a) motivated their complained of actions.

**12.** At trial, Jurek testified:

"Q Did you oppose the civil service membership that CLEAT was in favor of?

"A The civil service, no, not really, because it would have benefitted myself in the long run.

"Q Did you vote for it?

"A No, I didn't oppose it and I wasn't for it. I told everyone I would be in between. I wasn't going either way because my troops were all split.

"Q Did you vote?

"A No, sir, I didn't even vote."

**13.** In the course of questioning by Neubauer's counsel concerning the civil service referendum and CLEAT's relationship to it, DeLeon testified:

"Q Was Superintendent Jurek a member of the association?

"A No, sir, he was not.

"Q Did he take any actions you were aware of to support your organization?

"A No, sir, he didn't.

"Q Did he take any actions to discourage the organization?

"A Not that I know of."

The only evidence concerning whether Neubauer's membership in CLEAT affected Jurek's recommendation was Jurek's own testimony that he was not aware appellee was a member

on activity (a) (Neubauer's association with DeLeon or others who supported the civil service referendum), and since there is insufficient evidence to support a finding that Jurek was motivated by such activity, we cannot sustain the judgment against Jurek. It is accordingly set aside and remanded for another trial.

There also was insufficient evidence for the jury to have found that Police Chief Mussey recommended dismissal because of Neubauer's association with DeLeon or other supporters of the civil service referendum. Mussey acknowledged that, though he "never saw a membership list," he was under the impression that Neubauer was a CLEAT member and therefore that Neubauer probably associated with other CLEAT members. He also felt CLEAT was a divisive factor in the police force, and that the allegations against Davis would not have been pressed if he had been a member of CLEAT. But no evidence was presented to show that the police chief opposed the civil service referendum, that he knew appellee associated with DeLeon in particular, or that any association with DeLeon or other supporters of the civil service referendum in any way affected Mussey's decision whether to recommend termination. In fact, DeLeon testified that the police chief did not want to get involved in the civil service referendum one way or the other.[14] Finding insufficient evidence on this point, we reverse the

judgment against Mussey and remand for another trial.

## OTHER COMPLAINTS OF THE CHARGE

Appellants also complain that the district court, by including as a "protected" activity in subdivision (b) of the first interrogatory the making of untrue statements which the speaker "in good faith ... believed to be true," and by conditioning the appellants' good faith defense on the requirement that they not only in good faith believed Neubauer was "willfully untruthful" but also that they were reasonable in so believing,[15] in effect gave Neubauer unwarranted first amendment protection for his own negligent mistakes of fact, while denying protection to appellants for their negligent factual mistakes. While we have some question that these contentions were properly preserved by adequate objection below, we will address them to some extent in view of the real possibility of another trial.

Section 1983 provides a cause of action only for deprivation of rights, privileges, or immunities "secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (1981). The first amendment does not shield a governmental employee from the possibility that his employment might be terminated—however mis-

---

of the organization when he made his recommendation:
  "Q At the time you served on the Police Review Board and recommended that Mr. Neubauer be terminated, were you aware whether or not he was a member of CLEAT?
  "A No, sir, I did not.
  "Q Didn't what?
  "A Didn't know."

14. During examination of DeLeon by Neubauer's counsel, the following occurred:
  "Q What about Chief Mussey, did he join your association?
  "A No, actually, on this type of association—chiefs of police are not entitled to join this type of association, and I had some conversations with him in regards to the association.

"Q Was he in favor or was he against this referendum—I mean, the civil service election?
  "A At this particular time he didn't want to get involved."

15. The district court instructed the jury:
  "[I]f at the time the defendants and each of them were making these decisions that were made based on the evidence before them, they *reasonably* and in good faith *believed* that the *plaintiff was willfully untruthful* and not mistaken, then his discharge would be legal, *provided that a reasonably prudent person,* acting in good faith under the same or similar circumstances, *would have so believed."* (Emphasis added.)

taken *or unreasonable* that decision might be—so long as his employer is not *motivated* by the desire or intention to curtail or retaliate for employee activity which the Constitution protects. This, of course, is not to say that the governmental employer must know or believe that the Constitution protects the activity in order for the first amendment's restraints to apply; rather, it means that the employer's decision must be made on the basis of its belief that certain employee activity has occurred (or may occur), and that the activity which the employer believes to have occurred must be such as is protected by the Constitution (regardless of whether the employer believes the Constitution affords protection to the activity the employer believes has occurred). If the employer does not know of the protected activity, however, the employment decision is obviously not motivated by it. In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court wrote:

> "Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review *even if the reasons for the dismissal are alleged to be mistaken or unreasonable.*" 103 S.Ct. at 1690 (emphasis added).

In *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 S.Ct. 684 (1976), the Court, though the case before it did not involve a first amendment claim, used similar language, stating:

> "We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. *In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume

> that official action was regular and, if erroneous, can best be corrected in other ways.* The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions." 96 S.Ct. at 2080 (emphasis added).

We have quoted the above language from *Bishop v. Wood* as affording guidance in section 1983 cases involving claims by governmental employees that adverse employment action taken against them was motivated by their first amendment protected activities. *See, e.g., Allaire v. Rogers,* 658 F.2d 1055, 1058 (5th Cir.1981), *cert. denied sub nom. Rogers v. White,* 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 443 (1982); *Megill v. Board of Regents,* 541 F.2d 1073, 1077 (5th Cir.1976). As we said in *Professional Association of College Educators v. El Paso Community College District,* 730 F.2d 258, 265 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984), "the issue is not whether the discharge can somehow be objectively justified, but whether it was in fact *improperly motivated.*" (Emphasis added.)

██ It is not disputed that *if* Neubauer in fact made a willfully false statement to his superiors, and *if* in fact the making of such a willfully false statement was the only matter which motivated the decision to discharge him, that then the discharge decision would not be proscribed by the first amendment. Here there was substantial evidence that the statement was false in several respects and that Neubauer had information so reflecting. Neubauer, however, refused to admit that the statement was incorrect, and claimed that in any event he believed it to be accurate. The defendants, on the other hand, testified that they believed it was knowingly false, particularly as Neubauer persisted in it after being shown the evidence indicating that it was not correct. Hence, the jury could have found that the defendants believed in good faith (and were not recklessly or consciously indifferent to the correct-

ness of their belief) that Neubauer in fact made a false statement to them which he did not then in good faith believe to be true, and that was the reason they discharged him.[16] The district court, however, instructed the jury that such a belief on the defendants' part was relevant to the validity of the discharge decision only if the belief were "reasonable." That is to say, section 1983 liability was authorized on the basis of nothing more than mere simple negligence in making a mistake of *fact*. We believe that this incorrectly states the law in the context of a case such as this. It runs counter to the principle that it is the actual *motive* of the governmental employer which is crucial in first amendment discharge cases, not the accuracy of the employer's factual determinations. We think this is especially applicable in cases where the assertedly protected speech consists of an employee's report to his superiors of matters directly related to the employer's business which the employee observed in the course of his employment. We do not address substantially dissimilar contexts.

We distinguish the instant case from the issue presented in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). There, the Supreme Court applied an objective test to determine whether an official is entitled to qualified immunity under section 1983.[17] The Court held that officials are shielded from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. 102 S.Ct. at 2738. The *Harlow* Court, however, applied the objective test to determine the reasonableness of an official's mistake of *law*. For instance, if the defendants in

the instant case argued that they were unaware that the Constitution bars officials from dismissing an employee on account of his exercise of free speech, the *Harlow* Court would apply an objective standard to determine whether the defendants' conduct violated clearly established law "of which a reasonable person would have known." *Harlow*, 102 S.Ct. at 2738; *Rutherford v. United States*, 702 F.2d 580, 584 (5th Cir.1983); *Bueno v. City of Donna*, 714 F.2d 484, 495 (5th Cir.1983). The defendants do not contend that they are not liable because the law is unsettled, but because, assuming that Neubauer's statements were not intentional falsehoods, they made a mistake of *fact*. Under the facts *as the defendants testified they perceived them*, a dismissal premised on the belief that Neubauer had lied would not violate settled constitutional law.

▪ We next address another aspect of the court's instruction in this area. The court told the jury that Neubauer's statement constituted constitutionally protected speech even if it were materially false, so long as Neubauer in good faith believed it were true. In effect, the jury was told that Neubauer could not constitutionally be discharged for negligently making a materially false statement to his superiors. However, in our view the Constitution does not prevent the discharge of police officers for negligently misrepresenting material facts in making reports to their superiors on matters which directly pertain to the functioning or business of the police force and which the reporting officer observed in the course of his duties.[18]

We recognize, of course, that *Pickering v. Board of Education*, 391 U.S. 563, 88

---

16. Of course, we do not suggest what the proper resolution of that factual dispute is; nor do we intimate that the jury could not have found that Neubauer was discharged for breaking the "code of silence" by furnishing information to the grand jury concerning the July 17 Davis incident it was apparently considering.

17. The *Harlow* case involved a suit brought directly under the Constitution rather than under section 1983. In a footnote, however, the Court

noted that "'it would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.'" 102 S.Ct. at 2738 n. 30.

18. We note that defendants did not claim that they discharged Neubauer for making misstatements—or *any* statements—to the grand jury; conversely, Neubauer's claim was that in fact

S.Ct. 1731, 20 L.Ed.2d 811 (1968), held that a high school teacher could not be discharged even though a letter he had written on the subject of a proposed school tax that voters had just rejected, which subsequently was published in a local newspaper, contained factual misstatements concerning the amount the school district spent on athletics. He wrote the letter purportedly "as a citizen, taxpayer and voter, not as a teacher." The Court held that the first amendment barred discharge in such circumstances for false statements which were not "knowingly or recklessly made." But the *Pickering* Court expressly recognized in this connection that it was not laying down a general rule applicable to all situations involving statements by public employees.[19] It went on to list several factors, the presence or absence of which it felt to be significant in the case before it, including the fact that the letter was on a matter of public concern and did not relate to co-workers or immediate superiors. Significantly, the Court also observed in this regard that the misstatements in the letter concerned

> "matters of public record on which his position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer.... We are thus not presented with a situation in which a teacher has *carelessly* made false statements about matters so closely related to the day-to-day operations of the schools that any harmful

impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. Accordingly, we have no occasion to consider at this time whether under such circumstances a school board could reasonably require that a teacher make substantial efforts to verify the accuracy of his charges before publishing them." 88 S.Ct. at 1736–37 (footnote omitted; emphasis added).

The Court also noted that it was not faced with a situation where falsity in the statement might implicate the employee's fitness to perform his duties. *Id.* at 1737 n. 5.

Similarly, in *D'Andrea v. Adams*, 626 F.2d 469 (5th Cir.1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981), we held that a statement by a professor to a legislative committee which reported certain information received from other sources, identifying it as such, was constitutionally protected, notwithstanding that the information furnished by the third parties was not accurate. We pointed out that where the statement identifies what information is secondhand, falsity in the secondhand information itself does not render the *statement* false.[20] We went on to observe:

> "The allegations did not concern matters as to which Dr. D'Andrea might be presumed to have greater access to the real facts than would his intended audi-

---

any errors in his statement, whether to the officers or the grand jury, were not the reason, but were rather a pretext, for his discharge, and that the real reason for his discharge was his furnishing *any* information to the grand jury about the July 17 Davis incident, thus breaking the "code of silence" (and/or his involvement with supporters of civil service or CLEAT).

**19.** The Court observed:

"Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a gener-

al standard against which all such statements may be judged." 88 S.Ct. at 1735.

**20.** *See D'Andrea*, 626 F.2d at 474 n. 2:

"In any event, even if the *underlying information* conveyed in Dr. D'Andrea's statements was inaccurate, his statements cannot, on this record, be characterized as false. The evidence clearly shows that Dr. D'Andrea identified his information as hearsay or secondhand. A statement that 'someone told me' or 'I have heard' certain information simply is not false—even if the information is inaccurate—unless the speaker has not in fact acquired the information from another." (Emphasis in original.)

ence.... [H]e was careful to identify his information as hearsay when it was, in fact, second-hand information.... That he identified the sources of his information clearly suggests that he expected the legislature to investigate and verify the allegations before acting upon them ...." 626 F.2d at 476.

The statements which Neubauer made to his superiors here thus stand in marked contrast to the *Pickering* and *D'Andrea* statements. Unlike the employees in the latter two situations, Neubauer made statements to his employer as a part of the performance of his duties. Moreover, the statements concerned matters of the employer's business on which Neubauer had access to the facts reported, as he witnessed them, and on which his superiors to whom the statements were given did not, all of which Neubauer knew. And, of course, unlike *D'Andrea*, Neubauer did not purport to report simply what others told him, but rather what he saw and heard, where he was and what he was doing. Finally, the ability of a police officer to be accurate in his relation of matters observed in the course of his duties which he reports to his superiors is obviously something which impacts his fitness to perform his job. This, again, is in contrast to *Pickering* and *D'Andrea*.

In *Pickering*, the Court concluded:

"[I]n a case such as the present one, in which the fact of employment is only tangentially and insubstantially involved in the subject matter of the public communication made by a teacher, we conclude that it is necessary to regard the teacher as the member of the general public he seeks to be." 88 S.Ct. at 1738.

Here the fact of employment is directly and substantially involved in the subject matter of Neubauer's statements to his superiors, and he cannot fairly be regarded as making those statements in the capacity of a member of the general public.

■ We conclude that *Pickering* and *D'Andrea* do not require that first amendment protection against adverse employment action be generally applicable to negligently made material factual misstatements by an employee to his employer respecting matters pertaining to the employer's business and observed by the employee in the course of his duties. *See e.g., Megill v. Board of Regents*, 541 F.2d at 1083 (" '[t]he facts in this case could have been known to Megill had he undertaken any study' " before speaking; the employer properly relied on "petitioner's failure to investigate his facts before making the comment"), and at 1085 ("he made statements he *either* knew to be false, *or* that he could have easily investigated for accuracy" (emphasis added); the first amendment "does not, however, clothe a person with immunity when his statements are shown to be false and inaccurate, when their truth could be easily ascertained").

In the event of a retrial, the district court should be guided by the foregoing in framing its instructions, assuming similar evidence and contentions of the parties.

### CONCLUSION

For the reasons stated, the judgment below is reversed and the case is remanded for another trial as to each appellant.

REVERSED and REMANDED.